# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3607

_____

Robl Construction, Inc., a Kansas Corporation

*Plaintiff - Appellant*

v.

Andrew G. Homoly

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - St. Joseph

_____

Submitted: September 8, 2014
Filed: April 1, 2015

_____

Before RILEY, Chief Judge, SMITH and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

In this diversity case, see 28 U.S.C. § 1332(a)(1), (c)(1), Robl Construction, Inc. (Robl Construction), a Kansas citizen, appeals the adverse grant of summary judgment to Andrew Homoly, a Missouri citizen, on Robl Construction's claim that

Homoly breached an agreement personally to guarantee 40% of a $431,544.02 loan[1] Robl Construction made to Homoly & Robl, L.L.C. (Company). The district court found Homoly did not personally guarantee any loan from Robl Construction. Because the record and the parties' submissions reveal Robl Construction and Homoly genuinely dispute whether Homoly—by word and deed—authorized Robl Construction's loan to the Company and personally guaranteed repayment in accordance with the terms of the Company's agreements, we reverse and remand for further proceedings.

## I.     BACKGROUND

On October 29, 2002, Robl Construction, through its president Steve Robl, and Homoly formed the Company to purchase and develop residential real estate. Robl Construction and Homoly executed an operating agreement and a separate Buy-Sell, Option, and Financing Agreement (buy-sell agreement). Both agreements govern the Company's financial affairs and define the members' rights and duties in accordance with Kansas law. The buy-sell agreement controls in the event of an inconsistency.

As the only members of the Company, Robl Construction held a 60% share and Homoly held a 40% share. Steve Robl was the Company's tax matters partner, and his wife, accountant Vera Robl, assisted with the Company's financial records. Homoly primarily worked as a project manager in the field.

In 2004, the Company began to have financial problems. From 2006 to 2011, the Company operated at a loss and needed additional capital to continue operations.

---

[1]The parties varyingly refer to a revolving loan with multiple advances and multiple loans. Deferring to what we understand is Robl Construction's preferred characterization, we use the singular. See Young v. Allstate Ins. Co., 685 F.3d 782, 783, 784 (8th Cir. 2012) (explaining at summary judgment, we must "view[] the evidence and draw[] all reasonable inferences in the light most favorable to [Robl Construction], the non-moving party").

Robl Construction was periodically advancing money to the Company, and Steve Robl, Vera Robl, and Homoly discussed whether the Company should make a capital call or treat the advances as a revolving loan.

As relevant to this appeal, § 6.03 of the operating agreement required the consent of both Robl Construction and Homoly before

> D) The creation of any obligation or commitment of the Company, including the borrowing of funds, in excess of $10,000; [and]
>
>    . . . .
>
> I) Any act which would cause a Member, absent such Member's written consent, to become personally liable for any debt or obligation of the Company[.]

On July 31, 2006, Vera Robl notified Homoly by email that the Company needed "to make a capital call or increase loans on existing inventory." She advised that Robl Construction had "put in $71,500 so if you go the route of capital call, your share to get caught up would be $47,666." She asked Homoly to "[l]et [her] know what to do." When Homoly asked whether the $47,666 included $34,900 Homoly previously contributed, Vera Robl explained,

> No, the 71,000 is new money we've put in to cover all the carrying costs of the inventory. To match it, you would need to put in 47,666. . . . I've been treating the 71,000 like a loan from Robl Const, but I need to know what the plans are—will it be capital and you will match it, or will it be a loan and be repaid?

On August 2, 2006, Homoly responded,

-3-

> Wow, if my portion is $82,566, does this mean we are in the hole by $206,400? . . . I could put in that much money, but it would be a good sized hit for my liquidity. . . . With that in mind, I guess I would prefer the money from Robl to be considered a loan and then you guys get repaid with interest. If Steve would rather me put in a capital call, however, I will go ahead and write the check.

Vera Robl replied she would not "make any journal entries until [Homoly] and Steve talk this over." On appeal, Homoly—conceding he left the decision to Steve Robl's discretion—characterizes his response as "ask[ing] Steve Robl, the [Company's] tax matters and financial partner, to clarify which route the [Company] wishes to take."

Relying in part on this email exchange, Robl Construction avers the parties agreed to treat Robl Construction's periodic advances to the Company as a revolving loan. As Robl Construction sees it, Homoly not only requested the loan, but also agreed to be personally liable for 40% of the $431,544.02 debt pursuant to § 8 of the buy-sell agreement, under which Robl Construction and Homoly each "agree[d] to personally guarantee [their proportionate share of] any and all loans" to the Company at the request of the Company and the lender. See Kan. Stat. Ann. § 17-7688(b) (allowing members to opt out of the state's default non-liability rule and "agree to be obligated personally for any or all of the debts, obligations and liabilities of the limited liability company" "under an operating agreement or under another agreement").

On March 29, 2011, Robl Construction formally demanded that Homoly repay his share of the unpaid loan. When Homoly refused, Robl Construction sued Homoly for breach of contract, seeking $172,617.61 in damages—Homoly's share of the debt. Homoly moved for summary judgment, arguing (1) if the advances to the Company were failed capital calls, Robl Construction could seek, at most, dilution of Homoly's interest in the Company, and (2) if the advances were a loan, Robl Construction failed to meet the conditions precedent in the parties' agreements and to satisfy the statute

-4-

of frauds with respect to Homoly's alleged guarantee.[2]  In response, Robl Construction insisted the advances were a loan and argued genuine factual disputes precluded summary judgment.

Ostensibly accepting Robl Construction's characterization of the advances as a loan, the district court granted Homoly's motion, "find[ing] the money Robl gave the Company was not a personally guaranteed loan."  Robl Construction appeals.

## II.    DISCUSSION

Robl Construction and Homoly agree on little, but they do agree Kansas law governs their dispute.  See H & R Block Tax Servs. LLC v. Franklin, 691 F.3d 941, 943-44 (8th Cir. 2012) (applying state substantive law as specified by contract because Missouri, the forum state in a diversity case, generally enforces contractual choice-of-law provisions).  We review de novo the district court's application of state law and its grant of summary judgment.  See Bannister v. Bemis Co., 556 F.3d 882, 884 (8th Cir. 2009).  Summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

### A.    Judgment as a Matter of Law

In granting summary judgment to Homoly, the district court decided "there [wa]s nothing in the record showing that Robl [Construction] requested Homoly personally guarantee any such loan as the Buy-Sell Agreement clearly contemplates."  Rejecting Robl Construction's proposed interpretation of the 2006 email exchange between Homoly and Vera Robl, the district court found Homoly's email "may show

---

[2]Though he equivocates some, for purposes of appeal Homoly concedes the money was a loan, stating "[t]he District Court recognized that Robl Construction selected to pursue its claims as only a loan and not as a capital contribution" and "[n]o material fact dispute exists concerning whether or not the monies were loans or capital contributions."  We thus do not consider that issue.

that Homoly wanted Robl [Construction] to loan the Company money, but it does not indicate that Robl [Construction] requested for Homoly to personally guarantee the loan. Rather, the email communication shows a failed capital call attempt, and Homoly's preference—not request—that Robl loan the money to the Company."

Robl Construction contends this was error because the district court "premised its holding exclusively on the email exchange and failed to consider other evidence that Homoly" authorized and "personally guarantee[d] the loan." Robl Construction further asserts "[t]he District Court erroneously stepped into the role of fact finder and failed to resolve all facts and inferences in" Robl Construction's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 249 (1986) ("[A]t the summary judgment stage the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Henrickson v. Drotts, 548 P.2d 465, 468 (Kan. 1976) ("A court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties."). Robl Construction's points are well taken.

## B. Kansas Contract Law

Under Kansas law, "[t]he question whether a binding contract was entered into depends on the intention of the parties and is a question of fact." Reimer v. Waldinger Corp., 959 P.2d 914, 916 (Kan. 1998); see also Hays v. Underwood, 411 P.2d 717, 720-21 (Kan. 1966) (explaining that conflicting evidence and competing inferences as to the existence and terms of a contract present fact questions). "[W]hether a party's duty under a contract was based on a condition precedent is" also a fact question, Cravotta v. Deggingers' Foundry, Inc., 215 P.3d 636, 642 (Kan. Ct. App. 2009), as is the question of breach, see Wichita Clinic, P.A. v. Louis, 185 P.3d 946, 959 (Kan. Ct. App. 2008). "[I]nterpretation of the written terms of a contract, however, [is] a question of law." Reimer, 959 P.2d at 916.

-6-

A contract may be oral, written, or a mixture of both. See, e.g., Chilson v. Capital Bank of Miami, 701 P.2d 903, 907 (Kan. 1985). "Whether an ambiguity exists in a written instrument is a question of law for the court." Hollenbeck v. Household Bank, 829 P.2d 903, 906 (Kan. 1992). "[W]here ambiguity or uncertainty is involved, the parties' intent may be determined from all the language used in the contract, the circumstances existing when the agreement was made, the object sought to be obtained, and other circumstances, if any, which tend to clarify the intention of the parties." Id. "The terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances, as well as by the words that the parties employed." Unified Sch. Dist. No. 446, Independence, Kan. v. Sandoval, 286 P.3d 542, 546 (Kan. 2012).

### C. Genuine Disputes of Material Fact
#### 1. Consent and Personal Liability

Robl Construction credibly contends Homoly's words and deeds under the attending circumstances—considered in the light most favorable to Robl Construction—would enable a reasonable jury to find Homoly not only consented to the Robl Construction loan, but also agreed to be personally liable for 40% of the debt. In addition to the 2006 email indicating Homoly "would prefer the money from Robl [Construction] be considered a loan" to be repaid with interest, Robl Construction proposes the following evidence supports its breach-of-contract claim:

- Sworn testimony from Steve Robl indicating (1) Homoly requested the loan, (2) Steve requested, on behalf of Robl Construction and the Company, that Homoly personally guarantee the loan, (3) Homoly agreed to do so as required by the buy-sell agreement, and (4) Steve and Homoly frequently discussed the loan and the amount Homoly owed;

- Sworn testimony from Vera Robl that Homoly requested Robl Construction make a loan to cover the Company's shortages, rather than a capital call, and "constant[ly] communicat[ed]" with Robl Construction about the loan;

-7-

- Sworn testimony from Vera Robl and bookkeeper Sarah Lauffer indicating Homoly agreed to Robl Construction charging interest on the loan, and Homoly thought the interest rate was fair;

- Evidence the Company treated the advances from Robl Construction as a loan on its financial statements and attributed 40% of the debt to Homoly as it did with other outstanding loans;

- Evidence that for more than four years Homoly received those financial statements indicating he was liable for 40% of the loan at issue yet never objected or denied liability;

- Sworn testimony from Lauffer that upon receiving the financial statements, Homoly expressed "panic" about his growing losses; and

- Evidence that Homoly benefitted from the loan in that he avoided a capital call and maintained a 40% interest in the Company, and the loan "allowed him to offset the Company's losses against ordinary income on his individual tax returns."[3]

Predictably unswayed by Robl Construction's evidence, Homoly urges a different interpretation. Having disputed most of Robl Construction's "Additional Material Facts," Homoly maintains "nothing in the materials offered" shows the advances were a loan or that the conditions of the parties' agreements were met, including Homoly's consent to the loan and his assent to personal liability for the Company's debt.

---

[3]Homoly's claim that tax amendments he filed in 2011 "resolve[] any claim as to alleged tax benefits" and moot Robl Construction's argument that he received a benefit from the loan is without merit. That Homoly amended his taxes after denying liability for the loan does not deprive his prior actions of evidentiary value at trial. See Fed. R. Evid. 401.

Homoly, in his appellate brief, claims his intent in agreeing and consenting to personal liability in the buy-sell agreement was limited to a specific loan from a bank. Homoly also disputes the meaning and import of the pivotal 2006 email exchange and challenges Robl Construction's understanding of the parties' frequent communications about the loan and Homoly's personal liability for the debt. For example, in response to Vera Robl's testimony that Homoly's periodic requests for Robl Construction to "cover" Company shortages constituted "a loan in every way," Homoly contends his request to "cover" is "at best, an oral request for money and not a request for a loan"—arguably a distinction without a difference.

But questions of intent and whether the parties' statements and actions satisfied the conditions precedent in their agreements are precisely the type of factual disputes a jury must decide. See, e.g., First Nat'l Bank of Hutchinson v. Kaiser, 564 P.2d 493, 496-97 (Kan. 1977); M West, Inc. v. Oak Park Mall, L.L.C., 234 P.3d 833, 845-46 (Kan. Ct. App. 2010); Cherryvale Grain Co. v. First State Bank of Edna, 971 P.2d 1204, 1209 (Kan. Ct. App. 1999).

Further, under Kansas law, Homoly cannot avoid contractual liability "merely by claiming the conditions [precedent] have not been met." Barbara Oil Co. v. Patrick Petroleum Co., 566 P.2d 389, 393 (Kan. Ct. App. 1977). A party hoping to avoid liability "must affirmatively show that (1) the condition precedent actually failed and (2) because of such failure, the contract will not be performed." Id. Whether Homoly refused to perform based on "a genuine and good faith claim that a condition precedent failed is a question for the jury." Id.; accord JDN Dev. Co. v. Terra Venture, Inc., 265 F. Supp. 2d 1239, 1250-51 (D. Kan. 2003) (denying summary judgment where a party flatly asserted conditions precedent were not met).

Without addressing Homoly's burden and the jury's role in deciding questions of failed conditions under Barbara Oil Co., 566 P.2d at 393, the dissent concludes we

should not allow a jury to resolve this contract dispute because, in the dissent's view, Robl Construction waived any argument that Robl Construction "fulfilled § 6.03(D) and (I) of the operating agreement by loaning money to the Company with Homoly's prior consent." Post at 19. Leaving aside the incongruity of Homoly agreeing to guarantee the loan personally without consenting to the loan itself, the dissent's conclusion that Robl Construction "essentially ignores" § 6.03(D) and (I) is at odds with the record. Post at 18.

Rather than ignore the conditions precedent in § 6.03(D) and (I), Robl Construction, challenging the district court's determination that Homoly expressed a "preference—not request" for a loan, explicitly and repeatedly asserted in its appellate brief that the conditions were met. The dissent acknowledges as much, noting Robl Construction specifically asserted "Homoly consented to" the loan. Post at 20 n.6. Yet the dissent summarily dismisses that assertion because it "addresse[d]" a different argument. Id. The dissent's belief that this statement is the "only place in which Robl Construction even hints to argue that it fulfilled § 6.03(D)," id., conflicts with the record and the dissent's own analysis. In framing Robl Construction's arguments, the dissent admits Robl Construction asserted the loan met the requirements of the parties' agreements—which would unequivocally include § 6.03(D) and (I)—but concludes such a "general denial" is inadequate to preserve the issue. Post at 17.

Drawing a fine distinction between Homoly authorizing the loan and requesting it, the dissent concedes Robl Construction stated Homoly "requested" the loan and presumes Robl Construction was "arguing that such a request constituted the necessary 'prior consent of a Super-Majority-in-Interest' to fulfill § 6.03(D)." Post at 17. Yet this presumption apparently is not enough to prevent waiver. In claiming "Robl Construction waive[d]" its arguments, post at 19-20, the dissent overlooks, among other things, Robl Construction's assertions that (1) "Robl Construction

-10-

presented direct and circumstantial evidence . . . Homoly *consented* to the Robl Construction loans," and (2) the 2006 email exchange indicated "Homoly request[ed] Robl Construction make a loan and Robl Construction 'would get repaid.[']" (Emphasis added). We are satisfied Robl Construction did not waive its argument that Homoly consented to the loan as required by § 6.03(D).

The same is true for § 6.03(I). Despite claiming Robl Construction "essentially ignore[d]" § 6.03(I), the dissent later explains Robl Construction did not ignore § 6.03(I) at all but instead "argue[d] § 8 of the buy-sell agreement acts as Homoly's written consent," which satisfies § 6.03(I). <u>Post</u> at 18, 21. Robl Construction adequately preserved this issue as well.

### 2. Additional Writing and Timing Requirements

We also question some of Homoly's proposed interpretations of the writing and timing requirements in the parties' agreements. For example, Homoly does not provide any support for his assertions that § 6.03(D) of the operating agreement requires "*signed written* consent" for loans in excess of $10,000, or that the parties cannot designate the money from Robl Construction as a loan or request a guarantee after the receipt of funds. (Emphasis added). In Homoly's view, the Company had to obtain his consent before receiving any money from Robl Construction, even though he and Robl Construction had not yet decided whether the Company would treat the initial advances as a capital contribution or a loan.

As we read it, § 6.03(D) prohibits only "[t]he *creation of any obligation or commitment* of the Company, including the *borrowing* of funds, in excess of $10,000" without super-majority consent. (Emphasis added). At the least, the language is open to an interpretation under which the parties intended to require super-majority consent only before the Company was *bound*, and an undesignated advancement of funds does not necessarily impose any obligation on the Company.

-11-

A reasonable jury could find there was no such binding obligation or commitment from the Company unless and until the parties decided to treat the advances as a loan. At that point, the jury could reasonably find the requisite consent.

Even if the timing of the advances—as opposed to the obligation to repay—is unambiguously relevant, Homoly's analysis is incomplete. Most of the advances occurred after the 2006 email exchange and after disputed communications about the alleged loan. Homoly argues the evidence does not establish the Company "complied with the Super-Majority-in-Interest requirements necessary to even allow such loan(s) to be authorized prior to each being made." But if the parties agreed to a single revolving loan, as Robl Construction contends, with support from the email, we would not expect a separate consent before each advance.

To the extent the parties intended a series of smaller loans, record testimony from Vera Robl, Steve Robl, and Homoly describing frequent discussions about such loans plausibly suggests multiple loan requests from Homoly. Even absent direct evidence of consent for each advance, some of Robl Construction's alleged advances do not run afoul of § 6.03(D) because they do not exceed $10,000. Homoly does not account for these obvious inconsistencies and conceptual gaps.

### 3. Ratification

The facts also suggest Homoly may have ratified at least part of the loan to the Company by knowingly accepting the benefit. See Cherryvale Grain, 971 P.2d at 1208 ("'The acceptance and retention of the proceeds of a loan or of the benefits thereof, although made without authority, amount to an implied ratification of the loan.'" (quoting Allison v. Borer, 293 P. 769, 772 (Kan. 1930))); see also Sunflower Bank, N.A. v. Airport Red Coach Inn of Wichita, L.L.C., 175 P.3d 883, 2008 WL 360641, at *4 (Kan. Ct. App. Feb. 8, 2008) (per curiam) (unpublished table decision) (evaluating whether the members of a limited liability company impliedly ratified a

loan that was not authorized by the operating agreement based on the receipt of loan proceeds and other evidence of the members' intent).

Homoly testified he knew the Company "was getting a loan from Robl Construction, and they just kept getting more," and he understood that the money allowed the Company to operate without selling assets or making a capital call. Yet Homoly never told his business partner to stop loaning money to the Company. Robl Construction has adduced sufficient evidence of implied consent by ratification to create genuine disputes of material fact at least with respect to part of the loan.

### 4. Separate Guarantee

Nor can we accept Homoly's suggestion that written personal guarantees he and Robl Construction once executed at the request of a bank in connection with a construction loan indicate § 8 of the buy-sell agreement requires a separate "written consensual personal guarantee" before Homoly became personally liable. Neither the contract language nor the record supports Homoly's proposed separate guarantee requirement.

First, pursuant to § 8, Homoly expressly and unambiguously "*agree[d]* to personally guarantee *any and all* loans by *any* such lender to Company" "[i]f requested by the Company and *any* lender." (Emphasis added). See Stauth v. Brown, 734 P.2d 1063, 1069 (Kan. 1987). Section 8 says nothing about a separate written guarantee. If Robl Construction and Homoly truly intended to require a separate guarantee as Homoly suggests, they could have easily written that requirement into § 8, just as they expressly required a promissory note in § 7. They did not. "'Words cannot be read into the agreement which impart an intent wholly *unexpressed* when it was executed.'" Mears v. Hartford Fire Ins. Co., 667 P.2d 902, 905 (Kan. Ct. App. 1983) (quoting In re Estate of Johnson, 452 P.2d 286, 291 (Kan. 1969)). "[T]he more

logical conclusion is that the contract imposes no such obligation." Boos v. Nat'l Fed'n of State High Sch. Assocs., 889 P.2d 797, 802 (Kan. Ct. App. 1995).

Second, assuming we found § 8 ambiguous as to the parties' intent regarding a separate guarantee, Homoly is still unable to establish he is entitled to summary judgment as a matter of law. "[I]f the language of a contract is ambiguous and the intent of the parties cannot be ascertained from *undisputed* extrinsic or parol evidence, summary . . . judgment is inappropriate." Waste Connections of Kan., Inc. v. Ritchie Corp., 298 P.3d 250, 265 (Kan. 2013) (emphasis added); see also Nungesser v. Bryant, 153 P.3d 1277, 1288 (Kan. 2007) ("When the evidence pertaining to the existence of a contract or the content of its terms is conflicting or permits more than one inference, a question of fact is presented."); First Nat'l Bank, 564 P.2d at 496 ("Whether the guaranty was limited by a concurrent agreement of the parties . . . was . . . an issue of fact which could not be resolved as a matter of law.").

Finally, even if we could consider extrinsic evidence, see Butts v. Lawrence, 919 P.2d 363, 367 (Kan. Ct. App. 1996) (explaining that, absent ambiguity, it is "error to consider . . . extrinsic evidence of the parties' intent"), and resolve the alleged ambiguity in § 8, Homoly fails to adduce any competent evidence that the parties intended to include an unexpressed separate guarantee requirement in § 8. The fact the members once separately documented personal guarantees at the request of a third-party lender does not indubitably and forever establish the members' intent to require a separate guarantee for every loan. Indeed, the record is completely devoid of any evidence regarding the members' motive for executing the written guarantees on which Homoly relies—depriving those guarantees of evidentiary value. See, e.g., Canyon Creek Dev., LLC v. Fox, 263 P.3d 799, 801 (Kan. Ct. App. 2011) (recognizing courts must "view the evidence in the light more favoring the nonmoving party" and refusing to "speculate about the existence, motivating

-14-

influence, or possible consequence of any [personal] guaranties" because "there [we]re no facts whatsoever on th[e] issue" in the record).

Homoly has failed to show he is entitled to judgment as a matter of law under the parties' agreements.

### 5. Statute of Frauds

Although the district court did not reach this issue, Homoly argues Robl Construction's failure to satisfy the statute of frauds with respect to Homoly's purported guarantee provides an alternative basis to affirm summary judgment. See Kan. Stat. Ann. § 33-106 ("No action shall be brought whereby to charge a party upon any special promise to answer for the debt . . . of another person . . . unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith."). We disagree.

Robl Construction contends Homoly's personal guarantee falls outside the scope of the statute of frauds because Homoly's main purpose was not to answer for the Company's debt, but to avoid a capital call that would have been a "good sized hit for [his] liquidity." Under Kansas law, when

> the main purpose and object of the promisor is not to answer for another, but to subserve some purpose of his own, his promise is not within the statute [of frauds], although it may be in form a promise to pay the debt of another, and although the performance of it may incidentally have the effect of extinguishing the liability of another.

Allen v. Turner, 106 P.2d 715, 719 (Kan. 1940) (quotation omitted); accord Davis v. Patrick, 141 U.S. 479, 488 (1891) ("[C]ases sometimes arise in which, though a third party is the original obligor, the primary debtor, the promisor has a personal,

-15-

immediate, and pecuniary interest in the transaction, and is therefore himself a party to be benefited by the performance of the promisee. In such cases the reason which underlies and which prompted this statutory provision fails, and the courts will give effect to the promise.").

The Kansas Supreme Court has "held that whether such a promise was original or collateral [i]s ordinarily one of fact" to be determined from the surrounding circumstances. Allen, 106 P.2d at 719; accord Owensboro Wagon Co. v. D.A. Wilson & Co., 101 P. 4, 6 (Kan. 1909). That question of intent precludes summary judgment on this issue.

## III.   CONCLUSION

Robl Construction and Homoly have dramatically different views of the evidence. At this stage, the only question we must answer is whether "the evidence is such that a reasonable jury *could* return a verdict for" Robl Construction on its breach of contract claim "or whether it is so one-sided that [Homoly] *must* prevail as a matter of law." Anderson, 477 U.S. at 248, 252 (emphasis added). After careful review, we conclude the evidence is not so one-sided as to justify taking this case from the jury.

When viewed in the light most favorable to Robl Construction, the record "evidence is such that a reasonable jury could," id. at 248, find Homoly authorized and personally guaranteed at least part of the loan in accordance with the parties' agreements. This is not to say the jury would *have* to believe Robl Construction's account, but a reasonable jury *could*. At trial, Homoly may challenge Robl Construction's witnesses and its interpretation of the evidence; however, at this point, Homoly has fallen short of proving no genuine dispute of material fact exists on this record and that Homoly is entitled to summary judgment as a matter of law. We reverse the district court's judgment and remand for further proceedings.

-16-

SMITH, Circuit Judge, dissenting.

I respectfully dissent. In my review of this case, I believe the majority somewhat misses the mark by focusing on disputes of fact regarding Homoly's consent to be personally bound. The contract language requires focus on an antecedent inquiry: whether the loan(s) themselves are enforceable debts. If Robl Construction violated the operating agreement by improperly loaning the Company money without meeting the requisite conditions precedent, then neither the Company nor Homoly would be liable for their respective debts under the invalid loan.

I.

The majority not only liberally construes Robl Construction's arguments but raises arguments that Robl Construction did not. When Homoly moved for summary judgment, he argued five points: (1) the operating agreement did not provide for a direct cause of action for failing to meet a capital contribution; (2) the necessary preconditions to trigger liability under a capital contribution were not met; (3) the necessary preconditions to trigger a personal guarantee under § 8 of the buy-sell agreement were not met; (4) the loan was invalid because Robl Construction violated § 6.03(D) of the operating agreement; and (5) any alleged oral agreement of Homoly to be personally bound did not satisfy the statute of frauds. In its opposition, Robl Construction only addressed issues (1), (2), (3), and (5). Robl Construction sidestepped issue (4) with a general denial by asserting that "Robl Construction's loan and Homoly's personal guarantee and authorization do not violate the Operating Agreement or the Buy-Sell Agreement." Elsewhere, Robl Construction stated in passing that Homoly "requested" the loan. Although this argument was not clearly outlined, Robl Construction was presumably arguing that such a request constituted the necessary "prior consent of a Super-Majority-in-Interest" to fulfill § 6.03(D).

-17-

After resolving issues (1) and (2) by finding the advanced monies should be considered as a loan rather than a failed capital contribution, the district court granted summary judgment in favor of Homoly based on issue (3). The district court stated that "there is nothing in the record showing that Robl [Construction] requested Homoly personally guarantee any such loan as the Buy-Sell Agreement clearly contemplates." The court concluded that Robl Construction was only "rel[ying] on one email exchange between Vera Robl and Homoly" and found that, at best, the email exchange "may show that Homoly wanted Robl [Construction] to loan the Company money, but it does not indicate that Robl requested for Homoly to personally guarantee the loan." As the majority has indicated above, Robl Construction did not merely rely upon the 2006 email string, but also pointed to other pieces of evidence that raised a genuine dispute of material fact on whether Homoly agreed to *personally guarantee* the loan orally and in writing. Nevertheless, we need not adopt the district court's reasoning to affirm its grant of summary judgment.[4]

Robl Construction's argument avoids issue (4), that is, whether Robl Construction violated the operating agreement by advancing the Company monies without the "prior consent of a Super-Majority-in-Interest" under § 6.03(D). Further, § 6.03(I) requires either the prior consent of a Super-Majority-in-Interest to impose personal liability on any Member "for any debt or obligation of the Company," or the "written consent" of that Member to be personally bound. Robl Construction essentially ignores these contractual provisions.

---

[4]Even if the district court erred, this court is not constrained by the district court's rationale. It is well settled that "this court may affirm for any reason supported in the record, even if that reason is different from the rationale of the district court." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 1002 (8th Cir. 2011) (citation omitted). Further, "[t]his court may affirm the district court even if it committed legal error in reaching the correct result." *Id.* (citations omitted).

-18-

Homoly argues on appeal that he is entitled to judgment as a matter of law because Robl Construction broke the very rules that governed the operation of the Company. His points are well taken. As stated above, Robl Construction has not advanced an argument as to Homoly's *authorization* of the loan, but it has submitted evidence on his personal guarantee. Thus, my disagreement with the majority rests in Robl Construction's waiver of arguing that it fulfilled § 6.03(D) and (I) of the operating agreement by loaning money to the Company with Homoly's prior consent.

In Kansas, "[t]he general rule is that the extinguishment, release or discharge of the principal's contract relieves the guarantor of his or her obligation to pay." *Hill Petroleum Co. v. Pathmark Int'l, Inc.*, 759 F. Supp. 722, 725 (D. Kan. 1991) (citing *Iola State Bank v. Biggs*, 662 P.2d 563, 570 (Kan. 1983)). "The guaranty is an obligation collateral to another contractual duty to perform. . . . It is in the nature of a warranty by the guarantor that the thing guaranteed to be accomplished by the principal shall be done, and is not an engagement jointly with the principal to do the act." *Biggs*, 662 P.2d at 567 (citing *Trego WaKeeney State Bank v. Maier*, 519 P.2d 743 (Kan. 1974)). "As the extent of the liability of the principal debtor generally measures and limits the liability of the guarantor, and a guaranty is dependent on the existence of a principal obligation, if the principal contract is invalid for reasons inherent in itself, the guaranty generally is also invalid." 38A C.J.S. Guaranty § 15 (footnotes omitted); *see also* 38 Am. Jur. 2d Guaranty § 51 (1968) ("The guaranty promise is a promise to answer for the debt or the default of the principal debtor under his contract with the creditor. Therefore, unless the debtor is bound under the principal contract, there is no obligation which is guaranteed and the guarantor is not liable to the creditor if the debtor fails to perform."), *quoted in Precision Sawing, Inc. v. Cane Creek Concrete Servs., Inc.*, No. 5:13CV00054 JLH, 2014 WL 1154125, at *3 (E.D. Ark., May 20, 2014).

Whether Homoly personally guaranteed the loan only becomes a material question of fact for a jury after the loan's validity has been established. The former is built on the latter; if Robl Construction's loan to the Company is unenforceable because Robl Construction violated the Company's own operating agreement, then Homoly would not have a duty to personally repay the invalid loan amount. Thus, Homoly's personal guarantee would be of no effect and there would be no enforceable contract for Homoly to breach.[5]

Robl Construction did not show Homoly actually *authorized* the loan as is required by § 6.03(D) and (I) of the operating agreement. Addressing subsection (D), Robl Construction does not argue that Homoly gave his prior consent to the over $10,000 loan before the Company assumed the debt.[6] When a contract is unambiguous, "[t]he interpretation and legal effect of a contract is a question of law

_____

[5]A breach-of-contract claim for a personal guarantee fails when the loan to be personally guaranteed is not valid. It fails because most jurisdictions (including Kansas) require a valid contract to exist as a necessary element of the claim. *See Stechschulte v. Jennings*, 298 P.3d 1083, 1098 (Kan. 2013) (citing *Commercial Credit Corp. v. Harris*, 510 P.2d 1322, 1325 (Kan. 1973)). If the personal guarantee is invalidated because the principal loan contract is invalid, an enforceable contract does not exist between the guarantor and the lender.

[6]The only place in which Robl Construction even hints to argue that it fulfilled § 6.03(D) is in § II.A of its Appellant's Brief, entitled "The monies Robl Construction loaned to the Company were loans Homoly *consented* to, not capital contributions." (Emphasis added.) If Homoly indeed *consented* to the loan, this would fulfill the required prior consent of a Super-Majority-in-Interest because both he and Robl Construction consented to the Company taking on this debt. Upon closer examination, however, it is apparent that § II.A addresses the district court's finding that the money advanced by Robl Construction was a loan and not a failed capital contribution. Thus, Robl Construction does *not* argue that Homoly gave his prior consent to the loan itself. Instead, it argues that Homoly considered treating the monies as a loan rather than capital contributions.

-20-

for the court to decide, not a jury." *Wolfe Elec., Inc. v. Duckworth*, 266 P.3d 516, 534 (Kan. 2011) (citing *Osterhaus v. Toth*, 249 P.3d 888, 896 (2011)). Section 6.03(D) prohibits the creation of an obligation of the Company, which includes taking on a debt of over $10,000. Robl Construction contends Homoly agreed to personally guarantee the loan but ignores the antecedent inquiry of whether he authorized the loan in the first place. Logically, these are distinct legal questions. Whether Homoly agreed to personally guarantee the loan only becomes a material fact dispute if the debt itself is legally enforceable. As a result, I would affirm the district court's grant of summary judgment on the basis that Robl Construction has failed to show a genuine dispute of material fact that Homoly gave his prior consent to the loan, and due to Robl Construction's violation of § 6.03(D), Homoly is entitled to judgment as a matter of law.

Second, § 6.03(I) requires the "prior consent of a Super-Majority-in-Interest" when the Company takes "[a]ny act which would cause a Member, absent such Member's written consent, to become personally liable for any debt or obligation of the Company." Homoly asserts that he never gave such written consent. Robl Construction does not dispute that but argues that § 8 of the buy-sell agreement acts as Homoly's written consent. Both Robl Construction and the majority note that in cases of inconsistencies between the operating agreement and the buy-sell agreement, the latter controls. According to Kansas law, however, we must consider the two agreements together. *See First Nat'l Bank of Hutchinson v. Kaiser*, 564 P.2d 493, 496 (Kan. 1977) ("Where two instruments are executed by the same parties at or near the same time in the course of the same transaction, and concerning the same subject matter, they will be read and construed together." (citing *Amortibanc Inv. Co. v. Jehan*, 551 P.2d 918 (Kan. 1976); *Place v. Place*, 486 P.2d 1354 (Kan. 1971); *Skinner v. Skinner*, 270 P. 594 (Kan. 1928))). It is undisputed that the buy-sell agreement and the operating agreement were both executed on the same day by the

same parties and concern the same subject matter of the governing rules of the Company. Therefore, the two documents should be construed together.

Taking this into account, Robl Construction's interpretation of § 8 is contrary to Kansas law. Robl Construction argues that § 8 of the buy-sell agreement is in fact the very written consent required by § 6.03(I). This interpretation effectively reads § 6.03(I) out of the operating agreement. Why require the prior written consent of a member to be personally liable for Company debts in § 6.03(I) if such a section is unnecessary because § 8 of the buy-sell agreement acts as such prior written consent? Such an interpretation would lead to the absurd result of reading language out of the operating agreement in violation of Kansas contract interpretation principles. *See Garvey Ctr., Inc. v. Food Specialties, Inc.*, 519 P.2d 646, 649–50 (Kan. 1974) ("Results which vitiate the purpose or reduce the terms of the contract to an absurdity should be avoided. The meaning of a contract should always be ascertained by a consideration of all the pertinent provisions and never be determined by critical analysis of a single or isolated provision." (quotation and citation omitted)); *Johnson Cnty. Bank v. Ross*, 13 P.3d 351, 353 (Kan. Ct. App. 2000) ("The law favors reasonable interpretations [of contracts], and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided." (citing *City of Manhattan v. Galbrath*, 945 P.2d 10, 14 (Kan. Ct. App. 1997))).

The more reasonable interpretation that harmonizes the two contract provisions understands that § 6.03(I) requires a written consent from a Member to be personally bound for *any* debt of the Company, but § 8 highlights a subset of these types of debts in which a lender would want added security of the Company's debt in the form of a member's personal guaranty. Presumably, a written personal guaranty under § 8

-22-

would also fulfill the requirements of § 6.03(I).[7] Section 8 is not meant to fulfill § 6.03(I) and consequently write it out of the operating agreement; rather, § 8 is meant to provide a separate mechanism for the Company to acquire loans when the lender requires additional security to guarantee the loans.

Therefore, I would hold that Robl Construction has failed to present specific facts to show a triable issue for a jury as to whether § 6.03(I) was fulfilled. Further, as a matter of law, § 8 should not be interpreted as fulfilling § 6.03(I). Accordingly, I would affirm the district court's grant of summary judgment on this basis.

———————————————

[7]The record offers an example of such a transaction. Both Homoly and Robl Construction signed personal guarantees for loans to the Company from the lender North American Savings Bank, F.S.B. This example is not meant to prove the intent of the parties. Instead, it shows how a written personal guaranty can satisfy both § 8 and § 6.03(I).